## WHITE *v.* THE STATE.

BECK, J. 1. The written requests to charge, so far as legal and pertinent, were sufficiently covered by the charge given.

2. There being evidence from which the jury were authorized to find that the defendant was the slayer of the deceased, and the evidence for the State showing that the killing was unlawful, it was not error for the court to give in charge to the jury the following legal proposition: "If the killing is shown, and it is shown to be the act of the defendant, by evidence, beyond a reasonable doubt, it would then be on the prisoner to justify or mitigate the homicide; otherwise the jury would be author-ized to find him guilty of murder."

3. Exceptions to the court's charge, on the ground that is was error to in-clude therein the definition of murder, "because there is no evidence in the case of murder, or of any intention to kill," are without merit.

4. The evidence, though circumstantial, was sufficient to authorize the ver-dict, and the court did not err in refusing to grant a new trial.

*Judgment affirmed. All the Justices concur.*

Argued April 16,—Decided May 10, 1906.

Indictment for murder. Before Judge Roan. Fulton superior court. February 24, 1906.

White was convicted with a recommendation of life imprison-ment. In his motion for a new trial, to the overruling of which he excepted, he complained that the verdict was contrary to law and evidence; and that the court erred in refusing certain requests to charge, and in giving to the jury certain instructions referred

to in the headnotes. It seems, from the evidence for the State, that the accused and the deceased, one Quinn, went into a saloon on Peters street in the city of Atlanta, between nine and ten o'clock at night, that they quarreled in the saloon, and that the accused threw the deceased to the floor and against the foot of a bystander. On being remonstrated with by the bystander, the accused brandished a knife and declared he would cut anybody's throat "that didn't like what he was doing." The barkeeper testified, that while the accused and the deceased were drinking, the accused had a knife in his hand and told the deceased if "he did not do so and so he would kill him, . . and the man that was killed said there was no use of that, that they could fix it up otherwise." The accused and the deceased left the saloon together. Witnesses who saw them when they went out of the saloon testified that Quinn started to go one way and that White, the accused, pulled him around and carried him in the opposite direction. One witness testified: "They came out of the saloon locked up in each other's arms, and when they got out Quinn wanted to go up the street and White objected and took hold of him and carried him down the street with him. . . I understood him to say that he was going to cut him, or something to that effect, that night. I never seen any weapon or anything of that kind." Another witness said: "I heard Mr. White say something to Mr. Quinn, when they came out of the saloon. I was sitting in the restaurant door at 205 Peters street, and he said something to the one that had on the light suit, and the one that had on the light suit told him to hush, and he told him, God damn him, he would kill him before the night was out, and had a knife in his right hand. That was the man sitting there that had the knife in his hand. . . It was somewhere between nine and ten o'clock that this occurred, and I heard that he had been killed sometime after ten o'clock. . . The man that got killed is the one that had on the light clothes." Another witness testified that on the night of the homicide she was at No. 263 Peters street. "I didn't know T. K. Quinn in his lifetime," she said. "I have seen this man, Mr. White, sitting here. He was with a young-looking man, shaved clean. I didn't see the man he was with after he was dead. I didn't see or hear this man here saying anything or doing anything to the other man that was with him, only holding him and pulling him along. 'He was

saying some words, but I never understood them right good. He had hold of him, pulling him along. This other man was pretty drunk, it seemed like. I don't know how far from Gillett's saloon it was when I saw them, but we were down the street further." Quinn fell dead at the corner of Peters and Beerman streets, about six city blocks distant from the saloon where he and the accused quarreled." A witness testified: "I was standing on the corner of Beerman and Peters streets, with my back turned toward town, when the man that got killed walked up and said, 'Gentlemen, I am in a bad fix,' And I looked around at him, and by that time he made one step and fell. . . He fell right at me, nearly. He never got up any more. When I looked around I didn't notice any blood on his clothes, but after he fell I went and looked at him, and then I seed the blood. The blood was running out from under his collar. . . He didn't say another word after he fell." "I don't know exactly what time of night it was, but it was somewhere about nine o'clock. . . There was nobody with him when he came up." A police officer testified: "We arrested him [the accused] at his house between half past ten and eleven o'clock at night, on the same night of the killing. He made no remark to me before we arrested him. . . He and his wife were in the room, and we were up-stairs in the hallway. . . I was standing just outside of his door in the hall, and he was talking in there, and to the best of my knowledge he made this remark: 'The son of a bitch followed me and I fixed him.' I don't know who he was talking about, or anything. I suppose he knew I was out there at the time; he knew I was in the building, because we had been talking to him. I suppose he was talking to his wife, but of course I couldn't see him at all. I heard a woman's voice. . . I didn't really understand what she said to him, but to the best of my knowledge she asked him what he had done; that is the way I understood it, but I couldn't swear positively that was it." Another police officer, who assisted in the arrest, testified: "I didn't hear him say anything when we arrested him, but before we arrested him he was cursing in his room there, just cursing like a drunk man. He told us not to come in there, or he would cut our heads off. When they told him that the officers were out there after him, he just said that the first officer that came he would kill him, and his father came up and I told him to go in and get his knife, and he went

and got it, and brought the knife to me." The knife taken from the accused was identified by the witnesses who saw the difficulty in the barroom as being the knife held there by the defendant. A physician testified that the wound from which the death of the deceased resulted was barely half an inch deep, but that it penetrated a vital artery. In his opinion the instrument that inflicted the wound was sharper and more pointed than the knife introduced in evidence, although he said it was possible that the wound was inflicted with that knife.

*Reuben R. Arnold,* for plaintiff in error.

*John C. Hart, attorney-general, Charles D. Hill, solicitor-general,* and *Robert L. Rodgers,* contra.